## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 08-60168-CIV-UNGARO

JAMES WILLIAMS,
      Plaintiff,

v.

R.W. CANNON, INC., a Florida
corporation, d/b/a INTERSTATE BATTERY
SYSTEMS OF COASTAL FLORIDA, and
ROBERT W. CANNON, individually,
      Defendants.

_____/

### ORDER ON MOTIONS FOR SUMMARY JUDGMENT

THIS CAUSE is before the Court upon Plaintiff's Renewed Motion for Summary

Judgment as to Liability, filed July 10, 2008.  (D.E. 57.)  Defendants filed their Response on

August 6, 2008, (D.E. 81), to which Plaintiff replied on August 15, 2008 (D.E. 86).  Also before

the Court is Defendants' Motion for Summary Judgment, filed July 15, 2008.  (D.E. 61.)

Plaintiff filed his Response on August 1, 2008.  (D.E. 78.)  Defendants have not filed a reply.

Also before the Court is Plaintiff's Motion for Entry of Default and for Sanctions re: Plaintiff's

Renewed Motion for Summary Judgment, filed August 5, 2008.  (D.E. 80.)  Defendants have not

filed a response.  The matters are ripe for disposition.

THE COURT has considered the motions and the pertinent portions of the record and is

otherwise fully advised in the premises.

### PLAINTIFF'S MOTION FOR ENTRY OF DEFAULT AND SANCTIONS

As a preliminary matter, the Court addresses Plaintiff's Motion for Entry of Default and

for Sanctions with respect to Plaintiff's Renewed Motion for Summary Judgment.  Defendants

have repeatedly failed to adhere to this Court's deadlines.  As set forth above, Plaintiff filed his

Renewed Motion for Summary Judgment on July 10, 2008.  Accordingly, Defendants' response

was due to be filed on or before July 28, 2008.  On August 1, 2008, the Court entered an Order

extending the time for Defendants to file their response up to and including August 4, 2008.

However, Defendants did not file their response until August 6, 2008.  Meanwhile, on August 5,

2008, before Defendants filed their response, Plaintiff moved the Court for entry of default and

for sanctions based on Defendants' failure to comply with the Court's deadlines.

      "Summary judgment is appropriate where the 'pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law.'" *U.S. v. One Piece of Real Property Located at 5800 SW 74th Ave, Miami, Fla.*, 363

F.3d 1099, 1101 (11th Cir. 2004) (quoting Fed. R. Civ. P. 56(c)).  Thus, the Eleventh Circuit has

held that a "district court cannot base the entry of summary judgment on the mere fact that the

motion was unopposed, but, rather, must consider the merits of the motion."  *Id*. (citing *Dunlap*

*v. Transamerica Occidental Life Ins. Co.*, 858 F.2d 629, 632 (11th Cir. 1988)).  "The district

court need not sua sponte review all of the evidentiary materials on file at the time the motion is

granted, but must ensure that the motion itself is supported by evidentiary materials."  *Id*.  "At the

least, the district court must review all of the evidentiary materials submitted in support of the

motion for summary judgment."  *Id*. at 1101-02 (citing *Jaroma v. Massey*, 873 F.2d 17, 20 (1st

Cir. 1989) (per curiam) ("[T]he district court cannot grant a motion for summary judgment

merely for lack of any response by the opposing party, since the district court must review the

motion and the supporting papers to determine whether they establish the absence of a genuine

issue of material fact.")).  Accordingly, the Court cannot grant Plaintiff's Renewed Motion for Summary Judgment by default based on Defendants' failure to timely file their response and, therefore, Plaintiff's Motion For Entry Of Default and Sanctions is denied.

However, the Court notes that Defendants' late-filed response consisted of two documents: (1) an almost blank page (D.E. 81), and (2) a statement of disputed facts in opposition to Plaintiff's motion (D.E. 82).  At the request of Chambers, Defendants faxed their memorandum of law in opposition to Plaintiff's motion, which, presumably, Defendants failed to properly docket.  There is no evidence that Defendants ever attempted to correct their error by providing Plaintiff with a copy of the memorandum of law in opposition, and, therefore, the Court declines to consider it.  On the other hand, the Court will consider Defendants' statement of disputed facts in opposition to Plaintiff's motion, (D.E. 82) because although it was filed two days after the extended August 4, 2008 deadline, the Court does not see how Plaintiff would be prejudiced if the Court considers it.

<u>FACTS RELEVANT TO THE RESPECTIVE MOTIONS FOR SUMMARY JUDGMENT</u>[1]

Defendant R.W. Cannon, Inc., d/b/a Interstate Battery Systems of Coastal Florida

---

[1]Defendants have submitted a Statement of Undisputed Facts in Support of their motion, (D.E. 63), and Plaintiffs have submitted a response to Defendants' statement of facts as part of their Response to Defendants' Motion for Summary Judgement.  (D.E. 78.)  Likewise, Plaintiff has submitted a statement of undisputed facts in support of his Renewed Motion for Summary Judgment as to Liability, (D.E. 57), and Defendants have submitted a Statement of Disputed Facts in Opposition to Plaintiff's Renewed Motion for Summary Judgment as to Liability.  (D.E. 82.)  To the extent that Plaintiff does not controvert the facts alleged by Defendants and those facts are supported by the record, the Court adopts the facts contained within Defendants' statement.  Likewise, to the extent that Defendants do not controvert the facts alleged by Plaintiff and those facts are supported by the record, the Court adopts the facts contained within Plaintiff's statement.  *See* S.D. Fla. L.R. 7.5.D ("All material facts set forth in the movant's statement filed and supported as required by Local Rule 7.5.C will be deemed admitted unless controverted by the opposing party's statement . . . .").

("Interstate Battery") is a Florida corporation doing business in Broward County, Florida, and is a wholesale distributor of batteries in the South Florida market.  (Pl.'s Statement of Undisputed Facts (SOF) ¶ 1; Defs.' Statement of Undisputed Facts (SOF) ¶ 1.)

Interstate Battery has a fleet of trucks, each with clearance for gross vehicle weights of 25,000 pounds per vehicle.  (R.W. Cannon Aff. ¶ 2.)  Interstate Battery serves a territory entirely within South Florida between Oakland Park Boulevard at the southern boundary and Lantana Road at the northern boundary.  (Pl.'s SOF ¶ 17 & Ex. 4 (R.W. Cannon Dep. 6:14-7:21).)  The territory was set by Interstate Battery Systems of America (Interstate Battery's corporate office located in Dallas, Texas).  (Pl.'s SOF ¶ 17 & Ex. 4 (R.W. Cannon Dep. 6:14-7:21).)  As part of its distributorship agreement, Interstate Battery has agreed to limit its business to the abovementioned territory.  (Pl.'s SOF ¶ 20 & Ex. 4 (R.W. Cannon Dep. 7:10-18).)

Interstate Battery orders batteries from Johnson Controls in Tampa and keeps them until a customer orders directly from Interstate Battery.[2]  (Pl.'s SOF ¶¶ 21-22 & Ex. 4 (R.W. Cannon

---

[2]Under the law of the Eleventh Circuit, "[w]here a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."  *Van T. Junkins & Assoc., Inc., v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984).  In such a situation, a court may disregard the affidavit as a sham.  *Id*. at 658-59; *see also McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1240 (11th Cir. 2003) ("Under the law of this Circuit, we may disregard an affidavit submitted solely for the purpose of opposing a motion for summary judgment when that affidavit is directly contradicted by deposition testimony.").

Here, the Court finds that Cannon's deposition testimony was clear and unambiguous that Interstate Battery orders the batteries it sells from the Johnson Controls plant in Tampa, Florida.  (R.W. Cannon Dep. 8:20-9:2.)  Cannon's subsequent statement in his affidavit that Interstate Battery "obtains" batteries from Texas, Iowa, and Pennsylvania is vague insofar as he does not state whether he is referring to batteries that are shipped to Johnson Controls and then sold to Interstate Battery, or whether he is suggesting that Interstate Battery buys batteries directly from some out-of-state manufacturers.  (Defs.' SOF ¶ 1; R.W. Cannon Aff. ¶ 2.)  To the extent that the affidavit directly contradicts Cannon's previously given clear testimony with respect to the fact

Dep. 8:20-9:2).)  There are two ways that Interstate Battery distributes batteries to its customers.

One way is through a "two-week route service," pursuant to which Interstate Battery would have

a driver who "service[s] an account or regular cycle every two weeks," and "replace[s] the

inventory that is missing from that account."  (Pl.'s SOF, Ex. 4 (R.W. Cannon Dep. 9-10).)  The

other way is after an individual order is placed by a customer on the internet or by some other

method, and Interstate Battery fills the order from its own inventory.  (Pl.'s SOF ¶ 23 & Ex. 4

(R.W. Cannon Dep. 9-10).)  Some of the batteries that come to Interstate Battery's warehouse

have been manufactured in Mexico.[3]  (Defs.' SOF ¶ 1; R.W. Cannon Aff. ¶ 2.)

Plaintiff worked as a warehouseman at Interstate Battery from sometime in 2004 through

January 16, 2008, when he was fired.  (Pl.'s SOF, Ex. 2 (Williams Aff. ¶¶ 3, 11.); Defs.' SOF ¶

4.)

During the period that Plaintiff was employed by Interstate Battery, Defendant Robert W.

Cannon ("Cannon") was the President and sole director and shareholder of Interstate Battery and

was responsible for the day-to-day operations of the corporation.  (Pl.'s SOF ¶¶ 4,7; Defs.' SOF ¶

1.)  Cannon hired, determined the rate of pay for, assigned work to, and determined the work

schedules of Plaintiff and other employees.  He also was involved in the decision to terminate

employees and terminated Plaintiff.  (Pl.'s SOF ¶ 5.)  Cannon is the only person "who played any

that Interstate Battery obtains the batteries it sells from Johnson Controls in Tampa, Florida, the
Court disregards it.  *See Van T. Junkins & Assoc., Inc.*, 736 F.2d at 657.

[3]For the reasons set forth in note 2, *supra*, to the extent Cannon's statement in his
affidavit that some of the batteries that come to Interstate Battery's warehouse have been
manufactured in Mexico directly contradicts his previous deposition testimony that Interstate
Battery orders the batteries it sells from the Johnson Controls plant in Tampa, Florida, the Court
disregards this portion of Cannon's affidavit.  *See Van T. Junkins & Assoc., Inc.,*, 736 F.2d at
657.

role in controlling or directing Plaintiff's work and/or assigning work to Plaintiff; and in determining, calculating or setting his rate of pay or weekly wages."  (Pl.'s SOF ¶ 6.)

Upon being hired, Cannon trained Plaintiff for a period of approximately six months. (R.W. Cannon Dep. 36:1-11.)  When Plaintiff  began working for Interstate Battery, his job duties included unloading trucks, loading trucks, and general warehouse work, including processing, stocking, checking, cleaning, and charging batteries, as well as checking battery voltage, restocking batteries, and moving batteries with a forklift to proper placement on Interstate Battery's trucks.  (R.W. Cannon Dep. 36:12-15; 37:2-13; Defs.' SOF ¶ 5; Williams Dep. at 47.)  When Plaintiff unloaded batteries from trucks, he was unloading the batteries from Interstate Battery's company trucks and "manufacturing trucks."[4]  (R.W. Cannon Dep. 37:17-21.) When Plaintiff loaded batteries onto trucks, he was loading the batteries onto Interstate Battery's trucks.  (R.W. Cannon Dep. 37:22-25.)

During the course of his employment, Plaintiff's job duties expanded to include opening and closing the warehouse in the morning and the evening, auditing the drivers' returned pallets and "RBRs" (returned batteries), driving the trucks out of the warehouse so that they would be ready for Interstate Battery's route drivers, loading "DODDs" (batteries ordered from Interstate Battery and delivered to local auto dealers in Interstate Battery's territory in South Florida), and taking care of walk-in customers.  (Defs.' SOF ¶ 7; Williams Dep. at 48-49; Williams Aff. ¶ 8.)

 Cannon explained to Plaintiff how he wanted Plaintiff to load Interstate Battery's trucks for deliveries within Interstate Battery's service area.  (Williams Aff. ¶ 4.)  Plaintiff placed pallets of batteries on Interstate Battery's company trucks with a forklift.  (Williams Aff. ¶ 5.)

---

[4]Cannon did not testify as to the origin of the "manufacturing trucks."

6

The trucks had designated places where the pallets fit.  (Williams Aff. ¶ 5.)  There was no question as to where on the truck Plaintiff was supposed to put the pallets, and Plaintiff did not have to make any decisions other than to put the pallets in the assigned spaces.  (Williams Aff. ¶ 5.)  On a few occasions, after Plaintiff put the pallets on the truck, he would also hand-load batteries onto the trucks in any open space.  (Williams Aff. ¶ 5.)

Plaintiff had to make sure that the batteries were properly placed on the pallets so that they would not fall off, so that they were within the pallets, and so that they were not protruding from the pallets.  (Williams Dep. 75:3-11; R.W. Cannon Aff. ¶ 9.)  When loading a truck that would not be going out until the following day, Plaintiff was not to load the truck with pallets that were more than one layer high because Cannon did not want the excess weight sitting on the truck overnight.  (Williams Dep. 75-76.)

Cannon states in his affidavit that Plaintiff "had to be concerned about the weight of the pallets loaded on the trucks and make sure they were the appropriate weight for the vehicle," and that he either handled the job of loading Interstate Battery's trucks alone or supervised other employees loading the trucks.  (R.W. Cannon Aff. ¶ 9.)  Plaintiff testified during his deposition that he did not know the weight of the trucks he was loading.  (Williams Dep. 140:3-21.)  Plaintiff also testified that sometimes the pallets were weighed before loading, and he then was familiar with the weight of the pallets being loaded on the trucks.  (Williams Dep. 140:3-21.)

At one point, after some batteries had fallen off the "DODD" pallets, Cannon told the warehousemen who stacked the "DODD" pallets that all two-layer pallets were to be shrink-wrapped before they went out.  (Williams Aff. ¶ 9.)  Plaintiff did not stack the "DODD" pallets; other warehousemen did under Cannon's supervision.  (Williams Aff. ¶ 9.)

7

Cannon had a rule that Interstate Battery's drivers, not the Plaintiff, were responsible for the batteries on their trucks. (Williams Aff. ¶ 7.) Accordingly, at the end of each day, Interstate Battery's drivers would check the loads on the trucks they would be driving the next day. (Williams Aff. ¶ 7.) The following morning, the drivers would leave on their routes to make local deliveries, and the drivers would return to Interstate Battery's lot by late afternoon. (Williams Aff. ¶¶ 6-7.)

On occasion, Plaintiff would drive Interstate Battery trucks to pick up junk batteries, take a truck to be serviced or repaired, or deliver a battery within the hour (a "hot shot" delivery) to a customer. (Defs.' SOF ¶ 11; Williams Dep. 79:13-80:13.) These trips were all within Florida. (Williams Dep. 138:4-17.)

Plaintiff was not responsible for overseeing maintenance on Interstate Battery's trucks. (Williams Dep. 78:22-25.) Occasionally, Plaintiff checked the tire pressure on the trucks by thumping the tires or listened for the release of any air pressure. (Williams Dep. 78:25-79:5.) If a truck appeared to Plaintiff to have a problem, he would inform Cannon who would then decide whether and when a truck would be taken to the service and maintenance facility. (Williams Dep. 79:9-19.) Plaintiff testified that once he checked the tire pressure on any given truck, he does not believe that anyone came around after him to check the tire again. (Williams Dep. 139:22-140:2.) Plaintiff was not responsible for checking the trucks' oil or for making similar assessments, but if a truck had an obvious leak, Plaintiff would inform either Cannon or the truck's driver. (Williams Dep. 80:14-81:1.)

During his employment, Interstate Battery issued checks and W-2 Forms for 2005, 2006, and 2007. (Pl.'s SOF ¶ 8 & Ex. 2 (Williams Aff. ¶¶ 12-16 & Exs. A-E).) These W-2 Forms

reflect that Plaintiff received $30,596.52 in regular wages for 2005, $33,387.23 in regular wages for 2006, and $32,175.50 in regular wages for 2007.  (Pl.'s SOF, Ex. 2 (Williams Aff. Ex. A.).)

Plaintiff worked in excess of forty hours during one or more weeks in 2005, 2006 and 2007.  (Pl.'s SOF ¶ 9 & Ex. 2 (Williams Aff. ¶¶ 12-16 & Exs. A-E).)

In their answers to Plaintiff's first set of interrogatories, Defendants stated that during his employment, Plaintiff worked forty-three hours per week; that he was paid a salary of $30,000 per year, and was paid on a biweekly basis; and that he received holiday pay, sick pay, vacation pay and paid personal time off.  (Pl.'s SOF ¶ 10 & Ex. 3 (Defs.' Answers to Pl.'s First Set of Interrogatories).)  In his deposition, Plaintiff testified that when he began his employment at Interstate Battery, he "recall[s] that he would be started out with $30,000 a year," and that at that time he was told he would be working from 8:00 am to 5:30 pm.  (Williams Dep. 45:9-46:9.) Plaintiff further testified that he was told he would get a lunch break and one week of vacation. (Williams Dep. 46:10-20.)  During his deposition, Plaintiff agreed that if he worked from 8:00 am to 5:30 pm, and took a one-hour lunch break, he worked an 8.5-hour day, but he denied that he ever agreed that his salary would be based on a forty-three hour work week.  (Williams Dep. 119:20-120:5.)  Plaintiff testified that he does not think he was told whether he would get sick pay.  (Williams Dep. 46:21-25.)

According to Plaintiff, there were one or more weeks during 2005, 2006, and 2007 in which Plaintiff was paid a biweekly salary of $1,250.00, and was not paid at overtime rates for the overtime hours he worked. (Pl.'s SOF ¶¶ 11, 12 & Ex. 2 (Williams Aff. ¶¶ 13-15 & Exs. B-D).)  Also according to Plaintiff, there were one or more weeks during 2005, 2006, and 2007 in which Plaintiff was paid a biweekly salary of $1,250.00, and in addition was paid at a rate of

9

$21.63 per hour for some but not all of the hours he worked overtime.  (Pl.'s SOF ¶¶ 11, 12 & Ex. 2 (Williams Aff. ¶¶ 13-15 & Exs. B-D).)  Plaintiff also has provided evidence that there were one or more weeks during 2005 in which Plaintiff was not paid for hours he did not work, and his biweekly salary of $1,250.00 was docked accordingly.  (Pl.'s SOF ¶ 13 & Exs. 2 (Williams Aff. ¶ 13 & Exs. B & E), 3 (R.W. Cannon Dep. at 56).)

With regard to the number of hours Plaintiff worked and whether he was paid at a rate of time and a half for the overtime hours he worked, Defendants point to an employee insurance enrollment form signed by Plaintiff.  At the end of the insurance form, the following handwritten note appears: "30,000.00 salary based on 40 R. Hours and 3 OT per week."  (Pl.'s Reply in Support of Mot. for Summ. J., Ex. 1.)  The note was written by Robert W. Cannon.  (Janna Cannon Aff. ¶ 5.)  During his deposition, Plaintiff testified that the abovementioned handwritten note was not on the insurance form when he signed it.  (Williams Dep. 85:8-86:7.)

The Court notes that throughout his deposition Cannon testified that Plaintiff's $30,000.00 per year salary was based on a forty-five hour workweek.  (R.W. Cannon Aff. 11:17-19; 16:11-17:25; 20:1-21:7; 53:1-8; 54:23-55:9.)

<u>LEGAL STANDARD</u>

Summary judgment is authorized only when the moving party meets its burden of demonstrating that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56.  When determining whether the moving party has met this burden, the court must view the evidence and all factual inferences in the light most favorable to the non-moving party.  *Adickes v. S.H. Kress*

*& Co.*, 398 U.S. 144, 157 (1970); *Rojas v. Florida*, 285 F.3d 1339, 1341-42 (11th Cir. 2002).

The party opposing the motion may not simply rest upon mere allegations or denials of the pleadings; after the moving party has met its burden of proving that no genuine issue of material fact exists, the non-moving party must make a sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrell*, 477 U.S. 317 (1986); *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997); *Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir. 1989). If the record presents factual issues, the court must not decide them but must deny the motion and proceed to trial. *Envntl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. July 1981).[5] Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. *Lighting Fixture & Elec. Supply Co. v. Cont'l Ins. Co.*, 420 F.2d 1211, 1213 (5th Cir. 1969). If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment. *Impossible Elec. Techniques, Inc. v. Wackenhut Protective Sys., Inc.*, 669 F.2d 1026, 1031 (5th Cir. 1982); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[T]he dispute about a material fact is 'genuine,' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

Moreover, the party opposing a motion for summary judgment need not respond to it with evidence unless and until the movant has properly supported the motion with sufficient evidence. *Adickes*, 398 U.S. at 160. The moving party must demonstrate that the facts underlying all the

---

[5]Decisions of the United States Court of Appeals for the Fifth Circuit entered before October 1, 1981, are binding precedent in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981).

relevant legal questions raised by the pleadings or otherwise are not in dispute, or else summary judgment will be denied notwithstanding that the non-moving party has introduced no evidence whatsoever.  *Brunswick Corp. v. Vineberg*, 370 F.2d 605, 611-12 (5th Cir. 1967).  The Court must resolve all ambiguities and draw all justifiable inferences in favor of the non-moving party. *Liberty Lobby, Inc.*, 477 U.S. at 255.

<u>MOTOR CARRIER EXEMPTION</u>

A.   <u>Defendants' Motion for Summary Judgment</u>

Defendants move the Court for summary judgment on their affirmative defense that, by virtue of the Motor Carrier Act, Plaintiff is exempt from the FLSA's overtime requirements. Under the FLSA, an employer must compensate employees for hours worked in excess of forty hours per week "at a rate not less than one and one-half times the regular rate at which he is employed."  29 U.S.C. § 207(a)(1).  Defendants argue that Plaintiff's employment falls under the motor carrier exemption, 29 U.S.C. § 213(b)(1), and therefore Plaintiff is not entitled to overtime compensation.

"The question of how [Plaintiff spent his time working for Defendants] is a question of fact.  The question of whether [his] particular activities excluded [him] from the overtime benefits of the FLSA is a question of law."  *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986); *see also Morrison v. Quality Transp. Servs., Inc.*, 474 F. Supp. 2d 1303, 1308 (S.D. Fla. 2007) (citing *Icicle Seafoods*, 475 U.S. at 714).  The employer has the burden of proving the applicability of the FLSA exemption.  *Klinedinst v. Swift Inv., Inc.*, 260 F.3d 1251, 1254 (11th Cir. 2001); *see also Morrison*, 474 F. Supp. 2d at 1308 (citing *Klinedinst*, 260 F.3d at 1254). Exemptions to the FLSA "are to be narrowly construed against the employer who asserts them."

*Jeffery v. Sarasota White Sox, Inc.*, 694 F.3d 590, 594 (11th Cir. 1995); *Nicholson v. World Bus. Network, Inc.*, 105 F.3d 1361, 1364 (11th Cir. 1997) (recognizing that the FLSA's exemptions must be narrowly construed, "giving due regard to the plain meaning of statutory language and the interest of Congress," and also recognizing that "'[t]o extend an exemption to other than those plainly and unmistakably *within its terms and spirit* is to abuse the interpretive process and to frustrate the announced will of the people'" (quoting *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945))).

Under section 213(b)(1) of the FLSA, the provisions of section 207 "shall not apply with respect to any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49." 29 U.S.C. § 213(b)(1). As relevant to this action, section 31502(a)(1) of the Motor Carrier Act limits the application of section 31502's requirements to transportation "described in section[] 13501" of Title 49. 49 U.S.C. § 31502(a)(1). Section 13501 of Title 49 gives the Secretary of Transportation jurisdiction over interstate transportation of passengers or property by motor carriers. 49 U.S.C. § 13501.

The applicable regulations explain that the "exemption of an employee from the hours provisions of the Fair Labor Standards Act . . . depends both on the class to which his employer belongs and on the class of work involved in the employee's job." 29 C.F.R. § 782.2. More specifically, the Secretary of Transportation has the authority to establish maximum hours and qualifications of service for employees, and thereby trigger application of the motor carrier exemption, if two requirements are met: (1) an employee plaintiff must "be employed by carriers whose transportation of passengers or property by motor vehicle is subject to [the Secretary's]

13

jurisdiction" under the Motor Carrier Act; and (2) an employee plaintiff must "engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act."  29 C.F.R. § 782.2.

"The Department of Labor's jurisdiction under the FLSA and the Department of Transportation's jurisdiction under the Motor Carrier Act are mutually exclusive and there is no overlapping jurisdiction."  *Morrison*, 474 F. Supp. 2d at 1309 n.2 (citing *Morris v. McComb*, 332 U.S. 422, 437-38 (1947)).  "In order to avoid any conflicts between these Acts, Congress decided that the Secretary of Transportation need not actually exercise his or her power to regulate under the Motor Carrier Act and that the FLSA's § 213(b)(1) exemption applies so long as the Secretary has the authority to regulate over a particular category of employees."  *Id*. (citing *Spires v. Ben Hill County*, 980 F.2d 683, 686 (11th Cir. 1993)).

   1.   *Whether Interstate Battery Is A Carrier Whose Transportation of Property Is Subject to the Secretary's Jurisdiction Under the Motor Carrier Act*

"The carriers whose transportation activities are subject to the Secretary of Transportation's jurisdiction are specified in the Motor Carrier Act itself."  29 C.F.R. § 782.2(b)(1).  Defendants claim that Interstate Battery is a motor private carrier transporting property in interstate commerce within the meaning of the Motor Carrier Act, and therefore is a carrier whose transportation of property is subject to the Secretary's jurisdiction.  As defined by the Motor Carrier Act, a "motor private carrier" is "a person, other than a motor carrier,[6]

_____

   [6]A "motor carrier" is "a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(14).

14

transporting property by commercial motor vehicle (as defined in section 31132)[7] when—(A) the transportation is as provided in section 13501 . . . (B) the person is the owner, lessee, or bailee of the property being transported; and (C) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise."[8]  49 U.S.C. § 13102(15).  Pursuant to section 13501, the Secretary has jurisdiction "over transportation by motor carrier and the procurement of that transportation, to the extent that passengers, property, or both, are transported by motor carrier—

(1) between a place in—

(A) a State and a place in another State;

(B) a State and another place in the same State through another State;

(C) the United States and a place in a territory or possession of the United States to the extent the transportation is in the United States;

(D) the United States and another place in the United States through a foreign country to the extent the transportation is in the United States; or

(E) the United States and a place in a foreign country to the extent the transportation is in the United States; and

(2) in a reservation under the exclusive jurisdiction of the United States or on a public highway."

---

[7]A "commercial motor vehicle," as defined in section 31132, is a vehicle with a weight of at least 10,001 pounds.   49 U.S.C. § 31132(1)

[8]The Court notes that effective June 6, 2008, the definition of " motor private carrier" was amended to cover a person transporting property by any "motor vehicle," and not only persons transporting property by "commercial motor vehicle (as defined in section 31132)."  49 U.S.C.A. § 13102.

49 U.S.C. § 13501.

In determining whether an employer is a carrier whose transportation activities are subject to the Secretary's jurisdiction, courts look to such factors as whether the employer holds a permit or license from the United States Department of Transportation (USDOT); whether the employer operates vehicles whose weight or cargo capacity falls within the authority of the Federal Motor Carrier Safety Administration (FMSCA); whether the employer holds itself out as an interstate motor carrier or advertises interstate services; and whether the employer's interstate services are a significant component of its business. *See Baez v. Wells Fargo Armored Servs. Corp.*, 938 F.2d 180, 182 (11th Cir. 1991), *cert. denied*, 502 U.S. 1060 (1992); *Morrison v. Quality Transports Servs., Inc.*, 474 F. Supp. 2d 1303, 1309 (S.D. Fla. 2007); *Chao v. First Class Coach Co.*, 214 F. Supp. 2d 1263, 1271 (M.D. Fla. 2001); *Rossi v. Assoc. Limousine Servs., Inc.*, 438 F. Supp. 2d 1354, 1361 (S.D. Fla. 2006); *Morris v. McComb*, 332 U.S. 422 (1947); *Garcia v. Fleetwood Limousine*, 511 F. Supp. 2d 1233 (M.D. Fla. 2007).

In this action, Defendants appear to base their argument that Interstate Battery is a motor carrier transporting property in interstate commerce within the meaning of the Motor Carrier Act and whose transportation activities are therefore subject to the Secretary's jurisdiction, on the facts that (1) Interstate Battery's fleet consists of trucks that each weigh 25,000 pounds; (2) Interstate Battery obtains its batteries from Texas, Florida, Iowa; and Pennsylvania;[9] (3) once the

_____

[9]As set forth more fully in note 2, *supra*, Cannon's deposition testimony was clear and unambiguous that Interstate Battery orders the batteries it sells from the Johnson Controls plant in Tampa, Florida. Cannon did not mention any other source from which Interstate Battery orders the batteries it sells. Cannon's subsequent statement in his affidavit that Interstate Batteries "obtains" batteries from Texas, Iowa and Pennsylvania directly contradicts Cannon's previously given clear testimony that the source for its batteries is Johnson Controls, or is so vague as to be incompetent. Therefore, the Court disregards this portion of Cannon's affidavit.

batteries are inventoried at Interstate Battery's warehouse, the batteries go into vehicles that further travel in interstate commerce;[10] and (4) on occasion, Interstate Battery must ship defective batteries back to unidentified manufacturing facilities.[11]   However, the undisputed evidence in the record also establishes that during the relevant time period, Interstate Battery served a territory entirely within South Florida, that it ordered its batteries from a plant located in Tampa, Florida, and that it did not use its trucks to transport batteries or any other goods outside of the State of Florida.

Transportation that is within a single state may be considered movement in interstate commerce within the meaning of the Motor Carrier Act.  29 C.F.R. § 782.7.  However, for the reasons discussed more fully *infra*, Defendants have not established that Interstate Battery's intrastate transportation of goods is in interstate commerce for purposes of the motor carrier exemption, and Defendants have not provided any evidence establishing that such transportation constitutes a significant part of Interstate Battery's business.

Thus, taking all facts in the light most favorable to Plaintiff, the nonmoving party, the Court finds that Defendants have failed to establish that Interstate Battery transported property in interstate commerce within the meaning of the Motor Carrier Act such that it is a carrier subject to the Secretary's jurisdiction.   Accordingly, the Court finds that, at a minimum, there are genuine issues of material fact as to the first requirement for triggering application of the

---

*See Van T. Junkins & Assoc., Inc.,*, 736 F.2d at 657.

[10]Defendants have not provided any evidence to support this assertion, and it therefore appears to be mere speculation.

[11]This assertion also does not appear to be supported by any evidence in the record, and it therefore appears to be mere speculation.

exemption, precluding the Court from granting Defendants' motion for summary judgment on the issue of the motor carrier exemption.

2.      *Whether Plaintiff Engaged in Activities of a Character Directly Affecting the Safety of Operation of Motor Vehicles in Interstate or Foreign Commerce Within the Meaning of the Motor Carrier Act*

Furthermore, for the reasons that follow, the Court finds that Defendants have not met their burden of proving the applicability of the motor carrier exemption in this case because Defendants have not established that Plaintiff engaged in activities of a character directly affecting the safety of operation of motor vehicles in interstate or foreign commerce within the meaning of the Motor Carrier Act.

The regulations explain that the motor carrier exemption "is applicable under decisions of the U.S. Supreme Court, to those employees and those only whose work involves engagement in activities consisting wholly or in part of a class of work which is defined: (i) As that of a driver, driver's helper, loader, or mechanic, and (ii) as directly affecting the safety of operation of motor vehicles on the public highways in transportation in interstate or foreign commerce within the meaning of the Motor Carrier Act."  29 C.F.R. § 782.2(2)(b)(2) (citing *Pyramid Motor Freight Corp. v. Ispass*, 330 U.S. 695 (1947); *Levinson v. Spector Motor Serv.*, 330 U.S. 649 (1947); *Morris v. McComb*, 332 U.S. 442 (1947)).  Defendants argue that Plaintiff's work falls within the motor carrier exemption because his work involved engagement in activities consisting of work as a "loader" and as a "mechanic," as defined in the Motor Carrier Act.

The regulations explain that a "'loader,' as defined for Motor Carrier Act jurisdiction . . . is an employee of a carrier subject to . . . the Motor Carrier Act . . . whose duties include, among other things, the proper loading of his employer's motor vehicles so that they may be safely

18

operated on the highways of the country." 29 U.S.C. § 782.5(a).  An employee "engages, as a 'loader,' in work directly affecting 'safety of operation' so long as he has responsibility when such motor vehicles are being loaded, for exercising judgment and discretion in planning and building a balanced load or in placing, distributing, or securing the pieces of freight in such a manner that the safe operation of the vehicles on the highways in interstate or foreign commerce will not be jeopardized."  29 U.S.C. § 782.5(a) (citations omitted).  The regulations also explain that "[u]nloading," and "loading vehicles for trips which will not involve transportation in interstate or foreign commerce within the meaning of the Motor Carrier Act" have "been held to provide no basis for exemption."  29 U.S.C. § 782.5(c) (citations omitted).  "Loaders," within the definition of the Motor Carrier Act, "have a certain amount of skill and judgment attached to their duties in the proper distribution of weight in order to insure safety of operation."  *Pravia v. Blasa Group, Inc.*, No. 06-22775-CIV, 2008 WL 821611, at *4 (S.D. Fla. Mar. 27, 2008) (citations omitted).

The Court finds that Defendants have failed to establish that Plaintiff exercised discretion as to the manner in which the loading was done or possessed any knowledge or skill which would lend itself to be interpreted as having performed the kind of loading which would affect the safety of operation of motor vehicles in interstate commerce.  *See* 29 U.S.C. § 782.5(a); *Pravia*, 2008 WL 821611, at *4.  Indeed, to the contrary, much of the evidence in the record strongly suggests that Plaintiff simply placed batteries on pallets and then moved the pallets with a forklift and placed them in designated spaces on the trucks.   For example, Plaintiff states in his affidavit that Cannon explained to Plaintiff how he wanted Plaintiff to load the trucks, and that Plaintiff placed pallets of batteries on the trucks with a forklift in designated places where the

19

pallets fit.  Plaintiff further states that there was no question as to where on the truck he was

supposed to put the pallets, and that he did not have to make any decisions other than to put the

pallets in the assigned spaces.  (Williams Aff. ¶¶ 4-5.)  Plaintiff also explains that on a few

occasions he hand-loaded batteries onto the trucks into any open space after putting the pallets on

the truck.  The evidence in the record further reflects that it was Interstate Battery's drivers, not

Plaintiff, who were responsible for the batteries on their trucks.  (Williams Aff. ¶ 7.)  In this

regard, there is evidence that at the end of each day, the drivers would check the load on the

trucks they would be driving the following day. (Williams Aff. ¶ 7.)

       Defendants have not disputed these facts except to assert that Plaintiff had to be

concerned about the weight of the pallets loaded on the trucks and to make sure they were the

appropriate weight for the vehicle, and that he either handled the job of loading Interstate

Battery's trucks alone, or supervised other employees loading the trucks.  However, these facts

do not clearly establish that Plaintiff "exercise[d] judgment and discretion in "planning and

building a balanced load or in placing, distributing, or securing the pieces of freight in such a

manner that the safe operation of vehicles on the highways in interstate or foreign commerce will

not be jeopardized," 29 C.F.R. § 782.5(c), and therefore do not compel the conclusion that

Plaintiff's work for Interstate Battery falls within the motor carrier exemption.  Rather, the Court

finds that, at a minimum, Plaintiff's deposition testimony and affidavit demonstrate that there are

genuine issues of material fact with respect to whether Plaintiff's loading duties consisted merely

of providing physical labor in the lifting and moving of the batteries pursuant to Cannon's

direction, or whether Plaintiff was exercising independent judgement and discretion when doing

so.  *Pravia*, 2008 WL 821611, at *4.

Therefore, despite Defendants' arguments to the contrary, the Court concludes that Defendants have failed to establish that Plaintiff had discretion when performing his loading duties and is exempt from the FLSA's overtime requirements by virtue of being a "loader" for purposes of the motor carrier exemption. *Cf. Vaughn v. Watkins Motor Lines, Inc.*, 291 F.3d 900, 904-05 (6th Cir. 2002) (finding that even where an employer's dockworkers frequently operated under the direct control of a supervisor, the dockworkers exercised the judgment and discretion necessary to be considered loaders for purposes of the motor carrier exemption where these dockworkers "acknowledge[d] that they generally exercised their own judgment and discretion with respect to the most appropriate way to load the trailers," and "they also independently decided how to block the freight and load it high and tight," and in addition, they "prepared diagrams that designated any hazardous materials in the trailers," which "were intended to enable safety workers to reach the hazardous cargo quickly in the event of an accident, a purpose that [the dockworkers] both acknowledged); *Blankenship v. Thurston Motor Lines, Inc.*, 415 F.2d 1193 (4th Cir. 1969) (same).

Defendants also argue that Plaintiff is subject to the motor carrier exemption because he had "maintenance responsibilities" that were essential to the safe operation of Interstate Battery's trucks on the highways in interstate commerce, and therefore his work involved engagement in activities consisting of work as a "mechanic" for purposes of safety regulations under the Motor Carrier Act.

The regulations explain that a "'mechanic,' for purposes of safety regulations under the Motor Carrier Act is an employee who is employed by a carrier subject to the Secretary's jurisdiction under . . . the Motor Carrier Act and whose duty it is to keep motor vehicles operated

21

in interstate or foreign commerce by his employer in a good and safe working condition."  29

C.F.R. § 782.6(a).  The regulations further state that "[i]nspecting and checking air pressure in

tires, changing tires, and repairing and rebuilding tires for immediate replacement on the vehicle

from which they were removed have . . . been held to affect safety of operation directly."  29

C.F.R. § 782.6(a) (citing *Walling v. Silver Fleet Motor Express*, 67 F. Supp. 846 (D.C. Ky.

1946); *Walling v. Palmer*, 67 F. Supp. 12, 15 (D.C. Pa. 1946); *McDuffie v. Hayes Freight Lines*,

71 F. Supp. 755 (D.C. Ill. 1947)).

        In support of their argument, Defendants cite several cases in which it was found that the

employees whose job duties included such tasks as road-testing vehicles after performing

maintenance and repair qualified for exempt status by virtue of engagement in activities

consisting of work as a  "mechanic" for purposes of the motor carrier exemption.  *See Smith v.

United Parcel Serv., Inc.*, 890 F. Supp. 523, 528-29 (S.D.W. Va. 1995); *Lloyd v. Hi-Ridge

Transport*, 396 F. Supp. 2d 1290, 1298 (M.D. Ala. 2005) (finding that (1) the plaintiff was not

subject to the motor carrier exemption based on the fact that he installed brake pads on the

employer's trucks because he had no discretion in this task insofar as his brake work was always

reviewed by a mechanic, but that (2) the motor carrier exemption would apply based on the fact

that he checked tire pressure and put tires on trucks because his work was rarely, if ever,

reviewed; and also recognizing that (3) if the safety-affecting tire work was de minimus, the

motor carrier exemption would not apply).

        In this case, the record contains evidence that Plaintiff was not responsible for overseeing

maintenance on Interstate Battery's trucks.  (Williams Dep. 78:22-25.)  Plaintiff "occasionally"

checked the tire pressure on the trucks by thumping the tires or listened for the release of air

pressure.  (Williams Dep. 78:25-79:19.)  Plaintiff does not believe that after he checked the tire

pressure on any given truck anyone else double checked the tire pressure.  If a truck appeared to

have a problem, Plaintiff would tell Cannon, who would then decide whether and when a truck

would be taken to the service and maintenance facility.  (Williams Dep. 79:9-19.)  Plaintiff did

not check the trucks' oil or anything of that nature, but if a truck had a leak, for example, if there

was an apparent oil or brake fluid leak on the floor when a truck was moved, Plaintiff would

inform either Cannon or the truck's driver.  (Williams Dep. 80:14-81:1.)

The Court finds that this evidence is not sufficient to support a finding that Plaintiff's

work involved engagement in activities consisting of work as a "mechanic" for purposes of the

motor carrier exemption, because it was Cannon or the truck drivers who were ultimately

responsible for the tire safety decisions regarding service and maintenance.  *See Lloyd v. Hi-*

*Ridge Transport*, 396 F. Supp. 2d at 1298.  Furthermore, the record does not reflect that Plaintiff

or other employees changed or repaired the tires; rather, at Cannon's discretion, a truck needing a

tire repair or tire change would be taken to a service and maintenance facility.  Thus, the Court

concludes that although Plaintiff checked tire pressure as part of his job duties, Defendants have

not established that Plaintiff, in the performance of this responsibility, directly affected the safety

of operation of Interstate Battery's trucks, and accordingly, that he is exempt from the FLSA's

overtime requirements.

  3.  *Conclusion*

Based on the Court's foregoing findings that Defendants have failed to establish the two

requirements for triggering application of the motor carrier exemption, *i.e.* (1) that Interstate

Battery is a carrier whose transportation of property by motor vehicle is subject to the Secretary's

jurisdiction under the Motor Carrier Act, and (2) that Plaintiff engaged in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on public highways of property in interstate commerce within the meaning of the Motor Carrier Act, 29 C.F.R. § 782.2, Defendants' motion for summary judgment on the issue of the motor carrier exemption must be denied.

B.    <u>Plaintiff's Motion for Summary Judgment</u>

In his motion, Plaintiff  moves the Court for summary judgment on Defendants' motor carrier exemption defense, arguing that Defendants cannot meet their burden of proving the exemption applies.  The Court agrees because, based on the undisputed evidence in the record, the Court finds that even assuming Plaintiff was engaged in activities directly affecting the safety of operation of motor vehicles due to the fact that his job duties included loading batteries onto Interstate Battery's trucks and inspecting and checking the air pressure in Interstate Battery's truck tires, these activities did not directly affect the safety of operation of motor vehicles *in transportation in interstate commerce* within the meaning of the Motor Carrier Act.  In other words, there is no evidence in the record that the Interstate Battery trucks Plaintiff loaded with batteries and on which Plaintiff performed tire pressure and other inspections were used in the transportation of property that was being moved in interstate commerce for purposes of the motor carrier exemption.

An employee is not exempt from the FLSA's overtime provisions pursuant to the Motor Carrier Act "unless it appears, among other things, that his activities as a driver, driver's helper, loader, or mechanic directly affect the safety of operation of motor vehicles in transportation in interstate or foreign commerce within the meaning of the Motor Carrier Act."  29 C.F.R, §

782.7(a). The regulations explain that "[w]hat constitutes such transportation in interstate or foreign commerce, sufficient to bring . . . an employee within the regulatory power of the Secretary of Transportation . . . , is determined by definitions contained in the Motor Carrier Act itself," but that "[t]hese definitions are . . . not identical with the definitions in the Fair Labor Standards Act which determine whether an employee is within the general coverage of the wage and hours provisions as an employee 'engaged in (interstate or foreign) commerce.'" 29 C.F.R. § 782.7(a). Thus, while "transportation within a single State is in interstate commerce within the meaning of the Fair Labor Standards Act where it forms a part of a 'practical continuity of movement' across State lines from the point of origin to the point of destination . . . . such transportation may or may not be considered also a movement in interstate commerce within the meaning of the Motor Carrier Act."[12] 29 C.F.R. § 782.7(b)(1) (citing *Walling v. Jacksonville Paper Co.*, 317 U.S. 564 (1943)).

The Interstate Commerce Commission (ICC), the agency charged with implementing the Motor Carrier Act, has held that "transportation confined to points in a single State from a storage terminal of commodities which have had a prior movement by rail, pipeline, motor, or water from an origin in a different State is not in interstate or foreign commerce . . . if the

---

[12]The regulations explain that although "[d]ecisions of the Interstate Commerce Commission prior to 1966 seemingly have limited the scope of the Motor Carrier Act more narrowly than the courts have construed the Fair Labor Standards Act . . . . [i]t is deemed necessary, [ ]as an enforcement policy only . . . to assume that such a movement in interstate commerce under the Fair Labor Standards Act is also a movement in interstate commerce under the Motor Carrier Act, except in those situations where the Commission has held or the Secretary of Transportation or the courts hold otherwise." 29 C.F.R. § 782.7(b)(1). "[W]here . . . it has been authoritatively held that transportation of a particular character within a single State is not in interstate commerce as defined in the Motor Carrier Act . . ., there is no basis for an exemption under section 13(b)(1), even though the facts may establish a 'practical continuity of movement' from out-of-State sources." 29 C.F.R. § 782.7(b)(1).

shipment has no fixed and persisting transportation intent beyond the terminal storage point at the time of shipment."[13]  29 C.F.R. § 782.7(b)(2) (citing Ex parte No. MC-48 (71 M.C.C. 17, 29)).  Further, the ICC has specifically ruled that "there is not fixed and persisting intent where: (i) At the time of shipment there is no specific order being filled for a specific quantity of a given product to be moved through to a specific destination beyond the terminal storage, and (ii) the terminal storage is a distribution point or local marketing facility from which specific amounts of the product are sold or allocated, and (iii) transportation in furtherance of this distribution within a single State is specifically arranged only after sale or allocation from storage."  29 C.F.R. § 782.7(b)(2).

It is clear from the undisputed competent evidence in the record applicable to Plaintiff's motion that during the relevant time period, Interstate Battery served a territory exclusively within South Florida, and that Interstate Battery did not use its trucks to transport batteries or any other goods outside of the state of Florida.  The record also is clear that Interstate Battery orders its batteries from Johnson Controls in Tampa, Florida and keeps them in its inventory until it fills a customer's order.  The record further establishes that the two ways that Interstate Battery distributes batteries to its customers (all of which are indisputably in South Florida) are (1) through a "route service" by which Interstate Battery replenishes customer inventory from its own inventory, and (2) by filling individual orders from its own inventory as the individual

---

[13]As the Court recognized in note 12, *supra*, "where . . . it has been authoritatively held that transportation of a particular character within a single State is not in interstate commerce as defined in the Motor Carrier Act . . . , there is no basis for an exemption under section 13(b)(1), even though the facts may establish a 'practical continuity of movement' from out-of-State sources."  29 C.F.R. § 782.7(b)(1).

orders are placed.[14]

Nonetheless, presumably in order to argue that Interstate Battery's deliveries wholly within the State of Florida are part of a practical continuity of movement in interstate commerce for the purpose of the Motor Carrier Act, Defendants assert in their Statement of Disputed Facts in opposition to Plaintiff's motion that the batteries that Interstate Battery obtains for intrastate delivery are from Texas, Florida, Iowa, and Pennsylvania. For the reasons stated *supra*, this assertion does not demonstrate the existence of a *genuine* issue of material fact.[15]  Defendants further assert in their Statement of Disputed Facts in opposition to Plaintiff's motion that the Batteries Interstate Battery distributes to its customers go into vehicles that further travel in interstate commerce, but this vague and speculative assertion is unsupported by any citation to evidence in the record.  Therefore, it too fails to demonstrate the existence of a *genuine* issue of material fact.

In sum, Defendants have not presented any competent evidence from which a reasonable fact finder could conclude that Interstate Battery possessed a fixed and persisting transportation intent beyond the terminal storage point – *i.e.*, Interstate Battery's warehouse – at the time it received its batteries from Johnson Controls in Tampa.  Applying the "fixed and persisting transportation intent" principle, the Court thus finds that Defendants have failed to produce any competent evidence from which a jury reasonably could conclude that Plaintiff was engaged in

[14]The Court notes that Defendants' assertion in their statement of disputed facts in opposition to Plaintiff's motion that "Defendants also would deliver batteries to dealers, such as Lexus and Toyota, that were not filled out of their inventory" is not supported by any evidence in the record.

[15]*See* note 2, *supra*.

27

activities directly affecting the safety of operation of motor vehicles in transportation in interstate commerce within the meaning of the motor carrier exemption.[16]   Accordingly, the Defendants cannot possibly prevail on their motor carrier exemption defense and Plaintiff is entitled to summary judgment on this issue.

<u>LIABILITY FOR NON-PAYMENT OF OVERTIME WAGES</u>

Plaintiff moves the Court for summary judgment that Defendants are liable for nonpayment of overtime wages.   It is undisputed that Plaintiff was an employee of Interstate Battery, and that Interstate Battery is an enterprise engaged in commerce for purposes of establishing liability under the FLSA.[17]   Plaintiff also seeks to hold Robert W. Cannon

---

[16]        *See Baird v. Wagoner Transp. Co.*, 425 F.2d 407 (6th Cir. 1970), *cert. denied*, 400 U.S. 829 (1970) (holding that drivers of a transportation company's tank trucks, used to transport an oil company's products in Michigan, were not exempt under the motor carrier exemption where the oil company shipped petroleum products to a terminal in Michigan and knew each customer to be served, but, the specific quantity to each customer was not fixed at the time of the shipment and final transportation arrangements were not made until after the products were inventoried at the Michigan terminal); *see also Watkins v. Ameripride Servs.*, 375 F.3d 821 (9th Cir. 2004) (holding that the motor carrier exemption was not applicable where an employee made interstate deliveries of goods which were shipped via interstate means to a warehouse where they were stored until customer orders were received); *see also DeMaria v. Ryan P. Relocator Co.*, 512 F. Supp. 2d 1249, 1255-56 (S.D. Fla. 2007) (finding no fixed and persisting transportation intent beyond the terminal storage point at the time that goods were shipped to a Lakeland warehouse (the terminal storage point) where the employee transported goods from a warehouse in Lakeland, Florida to a warehouse in Pompano, Florida, which in turn were immediately delivered to end customers within Florida, and where those goods originated from outside of the State of Florida, but there was no evidence that the goods were shipped to the Lakeland warehouse pursuant to specific customer orders or contracts, and there was no evidence indicating how long the goods were stored in Lakeland before their ultimate delivery to customers).

[17]Under the FLSA, the phrase "enterprise engaged in commerce or in the production of goods for commerce" means an enterprise that: "(i) has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and (ii) is an enterprise whose annual gross volume of sales made or business done is not

individually liable for failure to pay Plaintiff overtime as required by the FLSA.  Defendants do not appear to dispute Cannon's status as an employer for FLSA liability purposes, and the Court finds, for the reasons that follow, that he may be held individually liable under the FLSA.

The FLSA contains a broad definition of employer with joint and several liability, and liability is based upon the existence of an employer-employee relationship.  *Patel v. Wargo*, 803 F.2d 632, 636 (11th Cir. 1986) (citing *Mitchell v. Whitaker House Coop., Inc.*, 275 F.2d 362, 364 (1st Cir. 1960) ("[T]he test of the applicability of the [FLSA] has been held to be whether or not as a matter of economic fact is an employer-employee relationship involved.")).  Whether Robert W. Cannon was Plaintiff's employer subjecting him to liability under the FLSA is a legal determination based upon the Court's findings of fact.  *Id*. at 634.  An employer includes "any person acting directly or indirectly in the interest of an employer in relation to an employee."  *Id*. at 637 (quoting 29 U.S.C. § 203(d)).

A principal shareholder of a corporation may be an employer within the meaning of the FLSA.  *Id*. at 637.  Moreover, it is well-settled that "a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages."  *Id*. at 637-38 (quoting *Donovan v. Agnew*, 712 F.2d 1509, 1513 (1st Cir. 1983), and citing *Donovan v. Grim Hotel Co.*, 747 F.2d 966, 972 (5th Cir. 1984), *cert. denied*, 471 U.S. 1124 (1985)).  To be personally liable for FLSA violations, a corporate officer must either be involved in the day-to-day functions of the corporation, or have some direct responsibility for the supervision of employees.  *Id*. at 638.  Involvement in the day-to-day operations of the corporation may include, for example,

---

less than $500,000 . . . ."  29 U.S.C. § 203(s)(1)(A)(i)-(ii).

compensation of employees or other matters in relation to employees, such as personally making decisions to continue operations despite financial adversity during the period of nonpayment. *Id.* (citing *Agnew*, 712 F.2d at 1514). Based on the undisputed evidence in the record, the Court finds that Robert W. Cannon was involved in the day-to-day functions of Interstate Battery, and that he had direct responsibility for the supervision of its employees. *See McLaughlin v. Stineco, Inc.*, 697 F. Supp. 436 (M.D. Fla. 1988). Accordingly, the Court finds that Robert W. Cannon was an employer for FLSA liability purposes.

An employee who brings a lawsuit under the FLSA for unpaid minimum wages or unpaid overtime compensation and liquidated damages bears the initial burden of proving that he performed the work for which he was not properly compensated. *Santelices v. Cable Wiring*, 147 F. Supp. 2d 1313, 1328 (S.D. Fla. 2001) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946), *superseded by statute on other grounds as stated in Carter v. Panama Canal Co.*, 463 F.2d 1289, 1293 (D.C. Cir. 1972)). In *Mt. Clemens*, the Court recognized that "[w]hen the employer has kept proper and accurate records the employee may easily discharge his burden by securing the production of those records," but "where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes a more difficult problem arises." 328 U.S. at 687. The *Mt. Clemens* Court held that in "such a situation . . . an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.*; *see Leonard v. Carmichael Prop. & Mgmt. Co.*, 614 F. Supp. 1182, 1186 (S.D. Fla. 1980) ("A prima facie case can be made through an employee's testimony giving his recollection of hours worked, although the court need not

accept every element of the plaintiff's case simply because the employer fails to produce records. A FLSA case is not to be dismissed nor should recovery be denied because proof of the number of hours worked is inexact or not perfectly accurate.  Where the inaccuracy is due to the employer's failure to keep adequate records as required by statute, and the employee has demonstrated that *some* work was performed for which he was improperly compensated, there is a right to recovery, even though the amount may be uncertain and damages difficult to calculate.") (citations omitted); *Brock v. Norman's Country Market, Inc.*, 835 F.2d 823, 828 (11th Cir. 1988) ("It is firmly established where an employer has not kept adequate records of their employee's wages and hours as required by the FLSA, the employees will not be denied a recovery of back wages on the ground that their uncompensated work cannot be precisely determined.") (citations omitted).

The *Mt. Clemens* court explained that the "burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence."  *Mt. Clemens*, 328 U.S. at 687-88.  Where the "employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate."  *Id*. at 688.

Pursuant to the FLSA's overtime requirements, overtime must be paid at a rate of not less than one and one-half times the regular rate of employee compensation.  29 U.S.C § 207(a)(1). "[E]arnings under the FLSA may be expressed on a salary basis in an employment contract, but without exception overtime compensation must be calculated based upon the hourly rate derived from such salary."  *Kohlheim v. Glynn County, Ga.*, 915 F.2d 1473, 1480 (11th Cir. 1990) (citing 29 C.F.R. § 778.109).  "The regular hourly rate of pay of an employee is determined by dividing

31

his total remuneration for employment (except statutory exclusions) in any workweek by the total

number of hours actually worked by him in that workweek for which such compensation was

paid."  29 C.F.R. § 778.109; *see also Kholheim*, 915 F.2d at 1480.  "If the employee is employed

solely on a weekly salary basis, his regular hourly rate of pay, on which time and a half must be

paid, is computed by dividing the salary by the number of hours which the salary is intended to

compensate."  29 C.F.R. § 778.113(a); *see also Kholheim*, 915 F.2d at 1480; *Rodriguez v. Farm

Stores Grocery, Inc.*, 518 F.3d 1259, 1268-69 (11th Cir. 2008).  Thus, for example, "[i]f an

employee is hired at a salary of $182.70 and if it is understood that this salary is compensation

for a regular workweek of 35 hours, the employee's regular rate of pay is $182.70 divided by 35

hours, or $5.22 an hour, and when he works overtime he is entitled to receive $5.22 for each of

the first 40 hours and $7.83 (one and one-half times $5.22) for each hour thereafter"; likewise,

"[i]f an employee is hired at a salary of $220.80 for a 40-hour week his regular rate is $5.52 an

hour."  29 C.F.R. § 778.113(a); *see also Kholheim*, 915 F.2d at 1480; *Rodriguez v. Farm Stores

Grocery, Inc.*, 518 F.3d 1259, 1268-69 (11th Cir. 2008).

Applying these principles in this case, the Court finds that there are genuine issues of

material fact as to Plaintiff's regular hourly rate of pay and the number of hours he worked

during one or more weeks in 2005, 2006, 2007, and, therefore, the Court is unable to determine

whether, as a matter of law, Defendants failed to pay Plaintiff overtime to which he was entitled.

It is unclear from the record whether Plaintiff was aware—or agreed—that his salary was based

on a workweek in excess of forty hours per week.  Moreover, if Plaintiff was paid the $30,000.00

salary based on a workweek in excess of forty hours per week, there is conflicting evidence in the

record as to whether Plaintiff's salary was based on a forty-three hour workweek, or whether it

was based on a forty-five hour workweek.  In any case, regardless of whether Plaintiff's regular

workweek consisted of forty, forty-three, or forty-five hours, there is conflicting evidence as to

whether, during one or more weeks in 2005, 2006, and 2007, Defendants failed to pay him

overtime rates for all of the overtime hours he worked.  Accordingly, because genuine issues of

material fact exist as to Plaintiff's regular hourly rate of pay and the number of hours he worked

during one or more weeks in 2005, 2006, 2007, Plaintiff's motion for summary judgment as to

Defendants' liability under the FLSA must be denied.  *See Mt. Clemens Pottery Co.*, 328 U.S. at

687-878 (explaining that where an employee carries out his or her burden by proving that he or

she has in fact performed work for which he or she was improperly compensated, the "burden

then shifts to the employer to come forward with evidence of the precise amount of work

performed or with evidence to negative the reasonableness of the inference to be drawn from the

employee's evidence").

<u>STATUTE OF LIMITATIONS</u>

Plaintiff moves for summary judgment as to the applicable statute of limitations.  The

"statute of limitations for claims seeking unpaid overtime wages [or minimum wages] generally

is two years [after the cause of action accrued], but if the claim is one 'arising out of a willful

violation,' another year is added to it."  *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515

F.3d 1150, 1162 (11th Cir. 2008) (quoting 29 U.S.C. § 255(a)).  "To establish that the violation

of the Act was willful in order to extend the limitations period, the employee must prove by a

preponderance of the evidence that his employer either knew that its conduct was prohibited by

the statute or showed reckless disregard about whether it was."  *Id*. at 1162-63 (citing

*McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)).  As defined by the Code of

Federal Regulations, "reckless disregard" is the "failure to make adequate inquiry into whether conduct is in compliance with the Act." *Id*. at 1163 (quoting 5 C.F.R. § 551.104). The "three-year statute of limitations may apply even when the employer did not knowingly violate the FLSA; rather, it may apply when it simply disregarded the possibility that it might be violating the FLSA." *Allen v. Bd. of Public Ed.*, 495 F.3d 1306, 1324 (11th Cir. 2007). "If an employer acts unreasonably but not recklessly in determining its legal obligation under the FLSA, then its actions should not be considered willful and the two-year statute of limitations should be applied." *Id*. (citations omitted). "The determination of willfulness is 'a mixed question of law and fact.'" *Id*. The law is unclear in the Eleventh Circuit as to whether the determination of willfulness for purposes of ascertaining the statute of limitations period is to be decided by the jury. *Id*. at 1163 & n.3. Indeed, in *Alvarez Perez*, the Eleventh Circuit indicated that it may be a decision either for the judge or the jury. *Id*.

          Plaintiff argues that the Court should find as a matter of law that Defendants' actions giving rise to his FLSA claim were willful, and that therefore the three-year statute of limitations should apply. However, questions of fact exist as to the whether, during one or more weeks in 2005, 2006, and 2007, Defendants failed to pay Plaintiff overtime rates for all of the overtime hours he worked. Thus, the Court cannot make a determination on the issue of willfulness until the issue of Defendants' violation of the FLSA is determined. *See Allen*, 495 F.3d at 1324 (concluding that because "triable issues of fact remain[ed] as to some of [the p]laintiffs' claims that they worked overtime without compensation . . . a determination of which statute of limitations to apply must be reserved until it is determined whether a violation of the FLSA occurred").

<u>LIQUIDATED DAMAGES</u>

Plaintiff also moves for summary judgment on the issue of his entitlement to liquidated damages.  The FLSA provides that "[a]ny employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b).  However, "the Portal-to-Portal Act . . . provides a good faith defense to employers to an award of liquidated damages 'if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA].'" *Spires*, 980 F.2d at 689 (quoting 29 U.S.C. § 260).  "If a court determines that an employer has established a good faith defense, it may, 'in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of [Title 29].'" *Id*.  The Eleventh Circuit has articulated the following standard for establishing a good faith defense:

> An employer who seeks to avoid liquidated damages bears the burden of proving that its violation was "both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon him more than a compensatory verdict."  An employer who knew or had reason to know that the FLSA applied, could not establish good faith as a defense. . . . Liquidated damages are mandatory absent a showing of good faith.

*Id*. (quoting *United States v. McKennon*, 814 F.2d 1539 (11th Cir. 1987) and citing 29 C.F.R. § 790.13-.22).  The FLSA "assigns to the judge the role of finding whether the employer acted in subjective and objective good faith for liquidated damages purposes." *Alvarez Perez*, 515 F.3d at 1163 (citing 29 U.S.C. § 260).  A determination as to Defendants' good faith for purposes of

35

deciding liquidated damages as to Plaintiff's overtime wages claim is premature insofar as the

issue of Defendants' violation of the FLSA has yet to be determined.

<u>CONCLUSION</u>

Based on the Court's foregoing analysis and conclusions, it is hereby

ORDERED AND ADJUDGED that Plaintiff's Motion for Entry of Default and for

Sanctions re: Plaintiff's Renewed Motion for Summary Judgment is DENIED.  It is further

ORDERED AND ADJUDGED that Defendants' Motion for Summary Judgment is

DENIED in accordance with this Order.  It is further

ORDERED AND ADJUDGED that Plaintiff's Renewed Motion for Summary Judgment

as to Liability is GRANTED IN PART and DENIED IN PART in accordance with this Order.

DONE AND ORDERED in Chambers at Miami, Florida, this 4th day of September,

2008.

_____
URSULA UNGARO
UNITED STATES DISTRICT JUDGE

copies provided:
counsel of record